# IN THE COURT OF APPEALS OF IOWA

No. 23-2028
Filed May 7, 2025

**BRADFORD WORRELL and NANCY WORRELL,**
    Plaintiffs-Appellants,

**vs.**

**LAKE CREST MANOR HOME OWNERS ASSOCIATION,**
    Defendant-Appellee.
_____

        Appeal from the Iowa District Court for Johnson County, Kevin McKeever,

Judge.


        Plaintiffs appeal the district court's judgment granting in part and denying in

part their claim of adverse possession.  **AFFIRMED.**


        Erek P. Sittig and Crystal K. Raiber of Phelan Tucker Law LLP, Iowa City,

for appellants.

        Thomas E. Maxwell of Leff Law Firm, L.L.P., Iowa City, for appellee.


        Considered without oral argument by Badding, P.J., Langholz, J., and

Carr, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2025).

**LANGHOLZ, Judge.**

The district court agreed with Brad and Nancy Worrell that they proved their adverse-possession claim for some—but not all—of the land that they sought to establish as theirs in this case. They now appeal, arguing that the court erred in refusing to find their claim established for more land because their use of the additional land was "factually the same" as the smaller parcel of land. The legal owner of all the land—Lake Crest Manor Home Owners Association—does not cross-appeal. So whether the Worrells proved adverse possession for that smaller, awarded parcel is not before us. And we agree with the district court that the Worrells did not prove adverse possession for the additional parcel because the record lacks clear and positive proof that they had a good-faith claim of right to the land or that their use rose to the level of hostile, actual, open, exclusive, and continuous possession for ten years. We thus affirm the district court's judgment.

I.

In 1993, Brad Worrell bought land in rural Johnson County described as "Lot 9, Part Four Lake Crest Manor . . . according to the plat thereof recorded" in a particular county plat book. But Worrell did not look at the plat before buying the land. And the seller told him that the lot extended to the west all the way to the shore of a pond. It turned out that the actual lot is smaller than Worrell thought, leaving a strip of land bordering the pond and jutting into the southwest corner of the lot that was still owned by his neighbor to the west—Lake Crest Manor Home Owners Association. He also learned that a gravel road that he had thought was his lot's northern border was actually built across a sliver of his land so that the pin

marking the northeast corner of his lot was in the middle of the road. At first, Worrell took no action to contest the boundaries of his lot or the road on his land.

The next year, things changed. Worrell—by then married to the other plaintiff in this case—learned that Lake Crest Manor wanted permission to use the gravel road that crossed his land to access a waste water treatment facility further to the west of the pond. Worrell opposed any increased use of the road unless he received some compensation. So he and his homeowners association engaged in negotiations with Lake Crest Manor. Worrell testified that he and the two associations agreed that Lake Crest Manor could use the road and would place a new culvert, the road would get finished, and in exchange, his lot would be replatted to create a new western border that included all the land to the shore of the pond and a slice of the pond itself too. The recent photo below—admitted as an exhibit at trial—shows the Worrells' actual lot line in black around the house numbered 4079. The new western boundary line claimed by Worrell is in red.



After allegedly reaching the agreement, Worrell never received any deed or other document memorializing a new property boundary. Indeed, Worrell only spoke to the president of Lake Crest Manor once early in the discussions—telling him what he wanted in return for granting permission—and never heard directly from Lake Crest Manor that an agreement was reached. But, as Worrell testified, "[t]he culvert was placed and the road got finished, so I just assumed that my land got repl[a]tted too." Aside from meeting minutes of Worrell's association showing there were discussions of the road issue and that the association supported compensating the Worrells and replatting their lot in some manner, no other evidence of a final agreement or property transfer is in the record.

When the Worrells began building a house on the land in 1998, they cleared it of timber with a bulldozer—both their original lot and the land that they believe they received in the 1994 deal with Lake Crest Manor—going as close to the pond as the bulldozer would allow. They also had to manually clear some trees nearest to the pond. In total, the Worrells estimate that they cleared "thousands" of trees. A contractor graded the land down to the pond so it could be seeded with grass. And from then on, they mowed the grass, cut down volunteer seedlings, and "planted probably a good 200 trees" throughout all the property. The Worrells estimate that they spent about $100,000 on improving their lot and the additional land.

Beyond the landscaping, the Worrells also built a "three-story scaffolding tower, kind of like a bird tower" to "watch nature" and be a safe place for their grandkids to play in 2007 or 2008. This structure was placed on the additional land they claimed from Lake Crest Manor that jutted into the southwest corner of their

lot—a more wooded terrain. They also erected a six-foot-tall fence around the structure with a "no trespassing" sign posted. And the Worrells placed a dock in the pond extending from the shoreline that they thought was their property starting around 2014 or 2015 and continuing until 2018.

Lake Crest Manor never complained to the Worrells about that original tree clearing that occurred in the 1990s. But in early 2001, Lake Crest Manor heard concerns that the Worrells were removing trees on its property and formed a committee to investigate. The committee members apparently never talked to the Worrells. But they did walk Lake Crest Manor's property, measured the lot line bordering the Worrells' lot, and concluded "the tree clearing discussed at the last meeting appears to have been done outside association property." So Lake Crest Manor saw no need to take any further action on that issue.

At some point, most likely around 1999, Lake Crest Manor's president called Brad Worrell to tell him he had to stop pumping water from the pond to fill a smaller pond that the Worrells were creating on their lot because the pond was Lake Crest Manor's property. The president says he may have also told him he could not cut down trees near the pond at that time. They argued about ownership. The president threatened to call the sheriff. And Worrell ultimately stopped the pumping—although he claims it was only because he had finished filling his pond.

Throughout the relevant timeframe since the Worrells cleared the land and started building their house, Lake Crest Manor did not maintain any of this disputed property. Rather, Lake Crest Manor viewed it as "a wild area" that did not require maintenance. It did arrange for a wildlife assessment by the Iowa Department of Natural Resources that it shared with its members. It also encouraged members

to get out into the area to enjoy nature and some did take advantage of that by fishing, hiking, or mushroom hunting. And the Worrells saw Lake Crest Manor residents drive tractors and lawn mowers carrying trash on the land between the pond and their official lot to dump the trash on neighboring land.

Sometime in late 2017 or early 2018, the Lake Crest Manor board began internal discussions about its concerns that the Worrells were encroaching on its property. It eventually decided to hire a surveyor to determine the accurate boundary between its lot and the Worrells' lot. Brad Worrell spotted the surveyors on the road and went out to talk to them. They told him that they were hired by Lake Crest Manor to do a survey and that he would need to talk to Lake Crest Manor's president for more information.

A few weeks later in early April, Worrell saw the president and another board member standing out in the road checking out the property pin in the middle of the road. Worrell told them that his property actually extended farther over from the pin and they asked if he had deed or other proof. He told them he could come up with proof and they invited him to come to their board meeting later that month. Worrell attended the meeting and made his case for the agreed transfer of the land, including sharing the minutes of his association's meeting at which the issue was discussed. The surveyors also presented the results of the survey and Worrell learned that Lake Crest Manor believed that it still owned all of the land within its surveyed plot boundaries.

A couple weeks later, counsel for Lake Crest Manor sent Worrell a letter requesting that he "remove all [his] personal property" from Lake Crest Manor's land within sixty days. Specifically, it asserted that he was "maintaining a dock,

tree stands, scaffolding, other debris and a burn pile" on the land and that he was "dumping construction material consistent of piles of bricks and other materials near the pond owned by" Lake Crest Manor. The counsel also informed Worrell that "any prior permissions or understandings with regard to the use" of the land were "expressly revoked" and that "[a]ny further incursions" onto the land would "be considered a trespass."

In response to the letter, the Worrells removed the dock. They did not remove the three-story-scaffolding structure or the fence around it. The Worrells had some further communications with Lake Crest Manor but did not resolve the dispute about the ownership of the land.

So the Worrells filed this suit against Lake Crest Manor in May 2019, seeking damages and a quitclaim deed for the property that they believe Lake Crest Manor gave to them as a part of the 1994 agreement over the road crossing their property. They asserted claims of adverse possession, boundary by acquiescence, breach of contract, and trespass. After a one-day bench trial in June 2023,[1] the district court rejected all the Worrells' claims except for the adverse-possession claim.

The court concluded that the Worrells proved their "adverse possession case with regard to some of the areas" but that the evidence was not "strong enough to support all of the area claimed." The court reasoned that it was "not convinced that the possession of the entirety of the disputed land was exclusive by clear and positive proof." And it found that "[a]part from the areas containing

---

[1] The trial had twice previously been set—in January 2021 and July 2022—and postponed by the court the day or two before each trial was set to begin.

the newly planted trees," the Worrells "did not establish open, notorious, actual, hostile possession with regard to any portion of the property." The court thus ordered that the Worrells' plot "should be redrawn to reflect the change in boundaries consistent with the behavior of the parties over the past 25 years." Specifically, it ordered that the western boundary of their plot "should be extended South until it intersects with the northwestern corner of" the plot to their south.

Both parties filed motions to amend and enlarge the ruling under Iowa Rule of Civil Procedure 1.904(2), seeking clarification about precisely what land the court was awarding to the Worrells under their adverse possession claim. The Worrells also sought a specific finding as to where they "removed and planted trees" and reconsideration of the court's ruling "[t]o the extent that the Court treated the area where [they] only removed trees differently from the area where [they] both removed and planted trees."

The court granted the parties' motions to enlarge its ruling, clarifying that it was awarding the Worrells the land to the southwest of their lot where the Lake Crest Manor lot juts eastward into the Worrells' lot. This is the parcel of land where the Worrells built the three-story scaffolding tower with a surrounding six-foot tall fence and a no-trespassing sign. The court included the same photo we include above to illustrate its order—using the purple line to mark the court-ordered boundary extension. The court also reiterated that it was not awarding the Worrells any of the pond, so if a straight north-south line would intersect the pond, the boundary line would follow the shore of the pond rather than crossing the pond. And the court explained why it did not award the Worrells more of the land on which trees had been cleared and planted:

> The Court was clearly convinced that the [Worrells were] improving the area to the Southwest of [their] property over the course of many years and it was further clear that [they were] treating the property as [their] own.  However the Court was not convinced that all of the elements of adverse possession were met for each and every portion of the entire area containing trees on the Eastern shore.

The Worrells now appeal.  Lake Crest Manor does not.

## II.

To prevail on a claim of adverse possession, a party "must establish hostile, actual, open, exclusive and continuous possession, under a claim of right or color of title, for at least ten years"  *Carpenter v. Ruperto*, 315 N.W.2d 782, 784 (Iowa 1982).  "Because the law presumes possession under regular title, the doctrine is strictly construed." *Id.*  And each element must be shown "by clear and positive proof"—inferences are not enough.  *Lawse v. Glaha*, 114 N.W.2d 900, 903 (Iowa 1962).

We review an adverse-possession claim de novo.  *See Louisa Cnty. Conservation Bd. v. Malone*, 778 N.W.2d 204, 206 (Iowa 2009).  But we give weight to the district court's factual findings—especially when based on witness credibility—mindful of the district court's "front-row seat to the live testimony."  *Hora v. Hora*, 5 N.W.3d 635, 645 (Iowa 2024).

On appeal, the Worrells have limited the additional land that they argue they adversely possessed.  Rather than seeking all the land to the red line on the photo above (which included part of the pond), they now seek only the land up to the pond where they removed and planted trees, except for the dam area south of the

pond.[2]  And of course, because Lake Crest Manor has not appealed the judgment against it awarding the portion of its property that juts south of the Worrells' property (to the east of the purple line on the photo above), that area of land is also not at issue.  Regardless of the result of this appeal, the Worrells are entitled to that land.  So the land still in dispute is essentially the strip between the Worrells' legal boundary of their lot and the shoreline of the pond, continuing up to the road. We must thus focus on whether they have shown by clear and positive proof that they adversely possessed this disputed land.  They have failed to do so twice over.

To start, the Worrells have not shown by clear and positive proof that they had a good-faith claim of right to the disputed land.  "[T]he adverse possession doctrine has no application to one who actually knows that he has no claim, or title, or right to a title." *Carpenter*, 315 N.W.2d at 785 (cleaned up).  This is because Iowa does not "recognize squatter's rights." *Id.* at 786.  To be sure, it is not fatal if the "claim of right is unenforceable or [the] title is known to be defective"— otherwise the doctrine would "serve no purpose." *Id.* at 785 (cleaned up).  But mere hostile, actual, open, exclusive and continuous possession for ten years is not enough unless the possessor has some good-faith "basis for claiming an interest in the property." *Id.*

The Worrells' sole theory of a claim of right is the alleged 1994 agreement to transfer ownership of the land from Lake Crest Manor to the Worrells.  But the only evidence supporting this agreement is (1) minutes from *their* association,

---

[2] The precise boundary now claimed—particularly around the dam area now disclaimed and the northern end of the property where the pond stops—is unclear from the Worrells brief and the exhibit that they cross-reference.  But it is ultimately immaterial given our resolution of the appeal.

which discusses the association's support of a potential deal, and (2) Brad Worrell's testimony, which in turn was only his *assumption* that a deal was reached. One party's unilateral assumption of a deal, without more, is not enough to meet the burden of clear and positive proof. *Mitchell v. Daniels*, 509 N.W.2d 497, 500 (Iowa Ct. App. 1993) (finding no clear and positive proof of a claim of right based on an oral contract supported only by the claimant's testimony).

But even if this essential requirement is met, we also agree with the district court's finding that they have not shown clear and positive proof that their possession was exclusive or that it rose to the level of hostile, actual, and open possession sufficient to put Lake Crest Manor on notice that it needed to assert its rights to kick them off its land. Of course, "there may be degrees in the exclusiveness even of the exercise of ownership" and an "owner cannot occupy literally the whole tract" of land "nor hold it in the grasp of his hands." *Booth v. Small*, 25 Iowa 177, 181 (1868). So we look for actions showing exclusive possession. *See id.* "The usual one is that of inclosure." *Id.* But a party claiming adverse possession of land need not necessarily "inclose it with fences" or "stand guard at all times upon its borders to oppose the entry of trespassers or hostile claimants." *Whalen v. Smith*, 167 N.W. 646, 647 (Iowa 1918). Where that is not possible, the claimant must "take[] and maintain[] such possession and exercise[] such open dominion as ordinarily marks the conduct of owners in general in holding, managing, and caring for property of like nature and condition." *Id.*

Here, the Worrells did not fence the disputed land to clearly claim possession and exclude members of the Lake Crest Manor from entering the land. They did not put up "private property" or "no trespassing" signs. And when they

saw members driving tractors and lawnmowers across the land to dump trash, they did tell them they could not do so. *Cf. Huebner v. Kuberski*, 387 N.W.2d 144, 146 (Iowa Ct. App. 1986) (finding adverse possession to fenced in area used only by claimant except for children who climbed over fence and claimant "yelled at them" to leave). Indeed, there is no evidence that the Worrells ever excluded anyone from the property. And when the Worrells were asked in 2018 by Lake Crest Manor to remove the dock from the disputed land into the pond, they did so—which we find inconsistent with the acts of an exclusive owner.

In contrast, on the property that the court did find adverse possession proven, the Worrells did put up a fence on part of the land. They posted no-trespassing signs on the fence. And they refused to remove the fence and the scaffolding structure when asked. While we acknowledge there is some evidence in their favor, we cannot say that the Worrells have met their heavy burden of showing exclusive possession of the disputed land by *clear and positive* proof.

Nor have the Worrells shown that their use of land was sufficiently hostile, actual, and open possession to put Lake Crest Manor on notice that it needed to act on its rights to kick them off its land within ten years. After all, "[t]he doctrine of adverse possession is based on the ten-year statute of limitations for recovery of real property" in Iowa Code section 614.1(5)(a) (2025). *Carpenter*, 315 N.W.2d at 784. To be sure, the initial clearing of thousands of trees, many of which would have been on this disputed land, almost certainly meets the requirements of hostile, actual, and open possession. *See Louisa Cnty. Conservation Bd.*, 778 N.W.2d at 208 ("Although mere use is insufficient to establish hostility or claim of right, certain acts, including substantial maintenance and improvement of the land,

can support a claim of ownership and hostility to the true owner." (cleaned up)). But that level of conduct was not continuous for ten years. And within a few years after that initial tree clearing, Lake Crest Manor was policing its property rights by investigating whether the Worrells were removing more trees from its property— even measuring the lot line to confirm that the clearing was happening on the Worrells' land rather than the disputed land. We recognize that the Worrells' conduct continuing to plant some new trees, mowing, and otherwise caring for that property provides some evidence of possession. But we, like the district court do not find it to be clear and positive proof of adverse possession. We thus affirm the district court's judgment.

**AFFIRMED.**